Monifa Holmes, : 
        Petitioner : 
         : 
        v. : 
         : 
Workers' Compensation Appeal : 
Board (Bayada Home Health : 
Care, Inc.), :     No. 43 C.D. 2019
        Respondent :     Argued: November 12, 2019

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY               FILED: December 12, 2019


Monifa Holmes (Claimant) petitions this Court for review of the Workers' Compensation (WC) Appeal Board's (Board) December 17, 2018 order affirming the Workers' Compensation Judge's (WCJ) decision suspending Claimant's WC benefits from May 13 to August 10, 2016, and denying and dismissing Claimant's Petition to Reinstate WC Benefits (Reinstatement Petition) and Petition for Penalties (Penalty Petition). Claimant essentially presents two issues for this Court's review: (1) whether the Board erred by suspending Claimant's benefits from May 13 to August 10, 2016; and (2) whether the Board erred by denying Claimant's Reinstatement Petition.[1] Upon review, we affirm in part, and vacate and remand in part.

---

[1] Claimant presents four issues in her Statement of Questions Involved: whether the Board erred by upholding the WCJ's decision (1) denying Claimant's Reinstatement Petition after her discharge; (2) finding Claimant rejected available work in bad faith; (3) concluding that Bayada Home Health Care, Inc. (Employer) met its burden in opposing the Reinstatement Petition; and (4)

**Background**

In 2015, Claimant was employed as a part-time per diem private-duty licensed practical nurse providing pediatric in-home or in-school care (*i.e.*, field work) approximately 25 to 32 hours per week for Bayada Home Health Care, Inc. (Employer) clients. *See* Reproduced Record (R.R.) at 176a, 178a, 467a, 501a. As a per diem employee, Claimant was not required to work, and Employer was not obligated to offer her any specific days or number of hours. *See* R.R. at 206a, 467a, 583a. Claimant's work days and hours varied depending on which available shifts she elected to work. *See* R.R. at 206a, 466a-467a, 583a. During that time, Claimant was also employed part-time by Saunders House Geriatric Center (Saunders House), working every other Tuesday, Friday and weekend, as a floor charge nurse.[2] *See* R.R. at 176a, 461a-463a.

On April 22, 2015, Claimant injured her left shoulder while working for Employer. On May 8, 2015, Employer issued a Temporary Notice of Compensation Payable accepting Claimant's injury as a left bicep sprain. *See* R.R. at 374a. Claimant's average weekly wage, initially calculated at $531.50 based upon her work with Employer, was eventually increased to $972.14 to include her concurrent employment with Saunders House.[3] *See* R.R. at 633a-634a.

---

granting Employer's Suspension Petitions. *See* Claimant Br. at 12-13. Since Claimant's first three issues are subsumed in this Court's Reinstatement Petition analysis, they have been combined herein. The two remaining issues will be addressed in reverse order because suspension and/or modification necessarily precedes reinstatement.

[2] Claimant did not return to work at Saunders House after her work injury, and Saunders House eventually discharged her. *See* R.R. at 179a, 463a-465a. Claimant has not worked for anyone other than Employer since April 22, 2015. *See* R.R. at 227a, 479a.

[3] Claimant's initial Statement of Wages was created before Employer was aware that Claimant was concurrently employed by Saunders House. *See* R.R. at 135a. According to Claimant's initial Statement of Wages, Employer awarded her $475.50 per week based on her $531.50 average weekly wage (calculated at $22.50/hour wage for days/evenings and $23.50/hour wage for nights/weekends). *See* R.R. at 402a-406a, 520a-521a. However, at the September 12, 2016 WCJ hearing, Employer offered, and the WCJ admitted, an Amended Statement of Wages

Claimant treated for her injuries and, eventually, was referred to orthopedic surgeon Anne E. Colton, M.D. (Dr. Colton). From April 22, 2015, until Claimant underwent surgery on August 3, 2015, Claimant performed light-duty work in Employer's office 25 hours per week on "any days." R.R. at 179a, 469a. After her August 3, 2015 surgery, Claimant remained off work until she was released to return to light-duty work. *See* R.R. at 180a. In January 2016, Claimant began attending classes at Cecil Community College in Elkton, Maryland on Tuesday and Friday mornings from 8:00 a.m. to 12:00 p.m.[4] *See* R.R. at 458a-461a.

Orthopedic surgeon Todd M. Kelman, D.O. (Dr. Kelman) conducted an independent medical examination (IME) of Claimant on February 2, 2016, after which he diagnosed Claimant with "resolving left shoulder pain status post debridement of a [superior labral anterior posterior(]SLAP[)] lesion, and tenotomy with biceps tenodesis of the left shoulder, . . . [with] some residual left rotator cuff tendonitis." R.R. at 430a, 445a. Dr. Kelman determined that Claimant needed approximately six to eight weeks of additional physical therapy, but that her prognosis was good. *See* R.R. at 431a, 446a. He opined that Claimant could return to work in a modified job without lifting, pushing or pulling over 15 to 20 pounds below chest level, repetitive grasping or overhead reaching with her left arm. *See* R.R. at 431a, 446a-447a, 601a. On February 25, 2016, Dr. Colton issued a status note reflecting: "[Claimant] may continue with light/sedentary duty with no lifting, pushing, pulling, carrying, or transferring greater than 20 [pounds]." R.R. at 600a.

By March 8, 2016 letter, Employer's Director Debra Kent (Kent) notified Claimant that a modified office job was available to her within her medical

---

reflecting that Claimant was paid $648.09 per week based upon a $972.14 average weekly wage. *See* R.R. at 135a-136a, 633a-634a.

[4] Claimant began taking classes at Delaware County Community College in the fall of 2014. *See* R.R. at 460a. Due to her January 2015 move from Pennsylvania to Maryland and her April 2015 work injury, Claimant did not resume classes until January 2016. *See* R.R. at 459a-461a.

restrictions, and requested that she call Kent by March 15 to discuss it. *See* R.R. at 468a, 497a-499a, 599a. On March 9, 2016, Employer issued a Notice of Ability to Return to Work based upon Dr. Kelman's release of Claimant to modified-duty work. *See* R.R. at 408a. At that time, Employer offered Claimant an ongoing 24 hours of work per week (Tuesday, Thursday, Friday from 9:00 a.m. to 5:00 p.m.), which matched her then-calculated $531.50 average weekly wage. *See* R.R. at 499a-500a, 504a, 507a-508a, 628a, 630a. On March 23, 2016, Claimant responded that since she attended school on Tuesdays and Fridays, she could only work on Thursdays, and she would begin on Thursday, March 31, 2016. *See* R.R. at 468a-470a, 499a-500a, 628a-629a. Claimant worked from 10:00 a.m. to 5:00 p.m. on March 31, 2016, but since she took an extended lunch break from 1:00 p.m. to 2:23 p.m., she only worked 5.5 hours that day.[5] *See* R.R. at 500a-502a, 564a-565a, 602a.

On March 31, 2016, Employer filed a Petition to Suspend WC Benefits effective March 15, 2016 (March 2016 Suspension Petition), because Claimant did not accept Employer's March 8, 2016 modified job offer. *See* R.R. at 5a-6a. In response, Claimant admitted that Employer offered her a modified job, but not at her pre-injury wage. *See* R.R. at 12a.

On April 5, 2016, Employer offered Claimant additional hours on Wednesday, April 6, 2016, but Claimant declined. *See* R.R. at 504a-505a. On April 12, 2016, Dr. Colton declared: "[Claimant] is cleared to return to work with no restrictions in regards [sic] to her left shoulder as of Monday[, April 18, 2016]." R.R. at 605a. Claimant worked from 9:30 a.m. to 5:00 p.m. on Thursday, April 14, 2016. *See* R.R. at 507a, 603a.

On April 22, 2016, Employer issued a Notice of Ability to Return to Work based upon Dr. Colton's release of Claimant to return to full-duty work. *See*

---

[5] Claimant was permitted a 30-minute lunch break during an eight-hour shift. *See* R.R. at 503a.

R.R. at 410a. By April 22, 2016 letter, Employer offered Claimant work in her pre-injury position that would allow her to meet her pre-injury $531.50 average weekly wage. *See* R.R. at 509a, 604a. Specifically, on April 27, 2016, Employer offered Claimant work from 8:00 a.m. to 6:00 p.m. on Tuesdays and Fridays beginning May 3, 2016, but Claimant refused the work because of her school schedule. *See* R.R. at 591a, 606a. Also on April 27, 2016, Employer offered Claimant a position beginning May 4, 2016 working Wednesday, Friday and Saturday from 7:30 a.m. to 5:30 p.m. that Claimant refused without stating a reason. *See* R.R. at 518a, 606a. Claimant did however, attend her annual two-hour in-service training on April 25, 2016. *See* R.R. at 510a. Claimant worked a shift on April 28, 2016, caring for an ambulatory 10-year-old child whose care did not require heavy lifting. *See* R.R. at 510a, 513a-515a. On April 27, 2016, Dr. Colton issued a work status note reflecting that "[Claimant] may return to modified work on [April 28, 2016] with restriction being no heavy lifting with [her] left arm."[6] R.R. at 611a.

On May 5, 2016, Employer filed a second Petition to Suspend WC Benefits to have Claimant's WC benefits suspended effective April 22, 2016 (May 2016 Suspension Petition) because Claimant had been released to her pre-injury position as of April 18, 2016, and Employer offered Claimant her pre-injury job.[7] *See* R.R. at 15a-16a. In her response, Claimant asserted that she not could not return to her pre-injury job. *See* R.R. at 23a.

Beginning on May 12, 2016, Employer offered Claimant numerous field nursing shifts which Claimant declined because she was unavailable, preferred not to

---

[6] Dr. Colton's work status note does not appear to have a corresponding office visit. *See* R.R. at 572a-574a, 595a.

[7] Employer requested supersedeas in both the March 2016 and May 2016 Suspension Petitions. *See* R.R. at 5a, 15a. After a hearing, the WCJ issued an interlocutory order on May 12, 2016, denying Employer's supersedeas requests, thereby requiring Employer to continue to pay Claimant's WC benefits and reasonable and necessary medical expenses related to Claimant's April 22, 2015 work injury. *See* R.R. at 27a, 29a.

lift over 40 pounds, or the assignment was not worth the travel. After Claimant's doctor issued new orders that Claimant was to avoid heavy lifting, Employer offered Claimant nursing shifts within those restrictions. Claimant attended two new case orientations and worked two other shifts between May 16 and May 26, 2016, but declined other shifts and hours Employer offered to her.

On May 26, 2016, Claimant filed the Petition to Review WC Benefits (Review Petition) and a request for penalties, claiming that her injury description and average weekly wage were incorrect, and that her work injury caused a decrease in her earning power.[8] *See* R.R. at 31a-32a. On May 30, 2016, Employer denied the allegations in Claimant's Review Petition. *See* R.R. at 39a. On May 31, 2016, Employer recorded that it received notice from Claimant's doctor that Claimant "may return to light duty with no lifting greater than 10 [pounds] and no overhead activity with [her] left arm. She may not lift any patients alone." R.R. at 631a.

Beginning on June 1, 2016, Employer began offering Claimant field nursing shifts within her medical restrictions. Claimant accepted 10 shifts but only worked 3. A client's mother refused to allow Claimant to work one, and Claimant called off the other 6.[9] Claimant never worked in the field with Employer's clients after June 6, 2016. *See* R.R. at 539a, 587a. On June 24, 2016, Employer issued a Notice of Ability to Return to Work based upon Dr. Colton's June 14, 2016 report releasing Claimant to return to work with lifting restrictions. *See* R.R. at 636a.

On July 15, 2016, Employer emailed Claimant regarding shifts available caring for one client "within [her] restrictions" from July 18 through September 5,

---

[8] The parties resolved the petition for penalties by stipulation in September 2016. *See* R.R. at 136a-138a, 638a-639a.

[9] Employer considers it calling off work if the employee gives fewer than 48 hours notice that she will not work her scheduled shift. *See* R.R. at 540a. Scheduling off is when an employee gives more than 48 hours notice that she will not work her scheduled shift. *See* R.R. at 540a. Employer considers scheduled off as a scheduled day off, as opposed to a call-out. *See* R.R. at 540a.

6

2016 from 7:00 a.m. to 5:00 p.m. R.R. at 541a-542a, 616a. However, on July 18, 2016, Claimant declared that she is "able to do office work only." R.R. at 540a-541a, 615a. After receiving official notification that Claimant was limited to light-duty office work, Employer offered Claimant work it had available in the office three days per week from 9:00 a.m. to 5:00 p.m. (*i.e.*, 24 hours).[10] Claimant accepted the part-time office job and began working on July 21, 2016; but, due to Claimant's breaks and extended lunch periods, Claimant never worked a full 24 hours in any one week. *See* R.R. at 186a-187a, 190a-191a, 543a, 552a. Moreover, Claimant's job performance did not meet Employer's expectations.

Notwithstanding, by August 10, 2016 letter, Employer offered Claimant ongoing office work within her restrictions for 40 hours per week (Monday through Friday from 9:00 a.m. to 5:00 p.m.), which would allow her to earn close to her pre-injury $972.14 average weekly wage.[11] *See* R.R. at 186a, 211a-212a, 551a-553a, 557a, 595a, 626a. Claimant started working for Employer full-time on August 15, 2016. Notwithstanding, due to her breaks and extended lunch periods, Claimant only worked 35 hours during the week of August 15, 2016, with no complaints related to her work injury.

On August 19, 2016, Employer filed a Notice of Suspension or Modification (Notice) changing Claimant's partial disability benefits to $48.09 per week effective August 15, 2016 because she was earning less than her time-of-injury earnings. *See* R.R. at 764a. Claimant did not oppose the Notice, and even stated in

---

[10] Kent described that only 24 hours per week were available to Claimant because other field employees also worked in the office, and Kent could only offer Claimant hours that those field employees were not already working. *See* R.R. at 557a.

[11] Employer's part-time administrative coordinator retired on July 15, 2016. *See* R.R. at 558a, 589a-590a. Knowing that Claimant needed the work, Kent made the additional office hours available for Claimant, rather than hiring a new administrative coordinator. *See* R.R. at 558a-559a, 587a, 589a-590a.

her brief to this Court that she "agree[d] to . . . [m]odification of her benefits." Claimant Br. at 30; *see also* Claimant Br. at 20, 38, 48.

Claimant worked only 35 hours for Employer during the week of August 22, 2016, and did not express any physical problems related to her work injury. She worked 40 hours during the week of August 29, 2016, also without physical difficulty doing the job. *See* R.R. at 187a-190a, 203a, 211a, 245a-247a.

On Sunday, September 4, 2016, after being treated for chest pains and palpitations, Claimant was ordered to remain off work September 5 through 7, 2016, and she notified Employer.[12] *See also* R.R. at 191a-194a, 214a-215a, 225a, 248a-249a, 729a, 748a, 758a-759a. In Claimant's absence, her office work backed up, particularly Employer's Medicare-regulated office filings. *See* R.R. at 732a.

Claimant underwent a second IME with Dr. Kelman on September 8, 2016, after which he recommended that Claimant continue her full-time sedentary job, with no lifting, pushing or pulling more than 30 pounds below her chest, and no overhead lifting greater than 5 to 10 pounds. *See* R.R. at 663a-664a, 693a-694a, 700a, 714a-717a. Claimant contends that, after her IME, her shoulder "was hurting more than usual and . . . [pain] was radiating to [her] neck." R.R. at 196a; *see also* R.R. at 195a, 217a-221a.

Claimant returned to work on September 9, 2016. *See* R.R. at 194a-195a, 215a-216a, 221a, 730a. Claimant worked a full day in Employer's office, but informed Employer that her "shoulder was hurting really bad. It flared up, and it -- radiat[ed] pain into [her] neck to the back of [her] shoulder." R.R. at 195a; *see also* R.R. at 217a. She was unable to obtain an appointment with Dr. Colton until September 13, 2016, but attended physical therapy and also treated at Springfield

---

[12] Claimant's symptoms were not attributed to her work injury. *See* R.R. at 213a.

Hospital, where she was given pain medication and steroids and told to follow-up with Dr. Colton. *See* R.R. at 195a, 197a, 217a.

A WCJ hearing was conducted on September 12, 2016. *See* R.R. at 65a. At the WCJ hearing, Employer presented, *inter alia*, Claimant's May 10, 2016 deposition, Dr. Kelman's June 13, 2016 deposition and Kent's August 16, 2016 deposition. See R.R. at 133a-134a. Employer also amended its March and May 2016 Suspension Petitions (collectively, Suspension Petitions) to Petitions to Modify WC Benefits (Modification Petitions). *See* R.R. at 131a.

Claimant did not work in Employer's office on Monday, September 12, 2016, but did work from 9:00 a.m. to 3:00 p.m. on September 13, 2016 without complaint. *See* R.R. at 197a-198a, 223a, 730a-731a. September 13, 2016 was the last day Claimant worked for Employer. *See* R.R. at 731a, 749a. On September 13, 2016, Dr. Colton ordered a cervical MRI, referred Claimant to another orthopedist and directed that she remain off work until her MRI results were back. *See* R.R. at 198a, 202a, 205a, 223a-226a, 718a-722a. Claimant notified Employer. *See* R.R. at 739a, 741a, 746a, 750a. During the weeks of September 13, 2016 and September 19, 2016, Employer divided Claimant's office tasks among three to five other employees who stayed late to complete Claimant's work. *See* R.R. at 731a-733a.

Claimant's September 20, 2016 MRI showed multiple-level degenerative changes in Claimant's cervical spine, which Dr. Kelman concluded were not related to Claimant's work injury or anything that occurred during Claimant's September 8, 2016 IME, since such chronic degenerative changes take time to form, and Claimant's cervical spine examinations had been normal. *See* R.R. at 205a, 649a, 666a.

9

On September 23, 2016, Claimant treated with Dr. Levenberg,[13] who recommended that Claimant follow up with pain specialist Gerald E. Dworkin, D.O. (Dr. Dworkin) and undergo an EMG, which she did. *See* R.R. at 198a-199a, 205a. Dr. Levenberg released Claimant to return to her light-duty office job on September 25, 2016. *See* R.R. at 206a. On September 23, 2016, Claimant emailed Employer at 3:33 p.m. advising Employer that she could return to work on Monday, September 26, 2016, but Employer notified her that the office job was no longer available. *See* R.R. at 201a-202a, 226a-227a, 250a-251a, 732a-733a, 741a. According to Employer, after covering Claimant's job duties for nearly three weeks and not knowing when or if she might return to work, on or about September 21 or 22, 2016, Employer hired someone to perform Claimant's clerical duties, and Employer's clinical managers thereafter conducted all case note readings. *See* R.R. at 733a-735a, 742a-743a, 749a.

On September 27, 2016, Claimant filed the Reinstatement Petition seeking to have her total disability benefits reinstated effective September 26, 2016. Therein, she alleged that, since she had been medically restricted to a sedentary job which was no longer available to her, her earning power was again adversely affected by her work injury. *See* R.R. at 42a. On October 3, 2016, Employer denied the allegations in Claimant's Reinstatement Petition, stating that Claimant had stopped working for reasons unrelated to her work injury and, thus, her earnings loss was not compensable. *See* R.R. at 50a.

On October 24, 2016, the WCJ conducted a hearing relative to the Reinstatement Petition, at which Claimant's counsel argued that Claimant's benefits must be reinstated because she was working her full-time light-duty position, but "was let go" by Employer after she "missed a couple [of] days from work really in

---

[13] Dr. Levenberg's full name is not contained in the record.

10

part because of the work injury."[14]  R.R. at 146a.  Employer's counsel argued that Claimant's full-time, light-duty position "would have been available had [] Claimant continued working . . . , but [] Employer can't just hold a position open indefinitely while [] Claimant's out alleging a new injury occurred at an IME exam."[15]  R.R. at 149a-150a.

On November 21, 2016, Claimant filed the Penalty Petition, claiming that since Employer withdrew its light-duty job offer and she was unable to work her pre-injury job, Employer violated the WC Act (Act).[16]  *See* R.R. at 53a.  On November 27, 2016, Employer denied the allegations in Claimant's Penalty Petition. *See* R.R. at 61a.  A WCJ hearing was conducted on January 11, 2017, at which Claimant presented her December 12, 2016 deposition, and the deposition of Dr. Dworkin, and Employer presented Kent's January 2017 deposition.  *See* R.R. at 65a.

On May 22, 2017, the WCJ concluded:

> Employer's Petitions for Suspension and Modification are granted.  Based on Claimant's concurrent wage and her ability to return to work, Claimant's benefits are modified as follows: from March 27, 2016 through April 4, 2016 to $288.09 per week; from April 5, 2016 through May 2, 2016 to $169.09 per week; from May 3, 2016 through May 12, 2016 to $235.60 per week; and, from May 13, 2016 through August 10, 2016 benefits are suspended.

WCJ Dec. at 15.  The WCJ also denied and dismissed Claimant's Reinstatement and Penalty Petitions.  The WCJ further granted Claimant's Review Petition to expand her work injury to "status post debridement of a SLAP lesion and biceps tenodesis,"[17]

---

[14] Claimant's counsel represented to the WCJ that Claimant "was out for four days and fired[.]"  R.R. at 150a.

[15] Claimant's counsel clarified that Claimant was "not alleging a new injury[.]"  R.R. at 150a.

[16] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

[17] Tenodesis is the surgical "release of the long-head biceps tendon where it anchors to the area where the labrum is near the top, [that is] reattach[ed] a little further down, either with a screw or a staple."  R.R. at 426a-427a.

and awarded Claimant's counsel litigation costs. WCJ Dec. at 14. Claimant appealed to the Board which affirmed the WCJ's decision on December 17, 2018. Claimant appealed to this Court.[18]

**Discussion**

Initially, Section 413(a) of the Act states, in pertinent part:

> A [WCJ] . . . may, at any time, modify, reinstate, [or] suspend . . . a notice of compensation payable . . . upon petition filed by either party . . . , upon proof that the disability of an injured employe has increased, decreased, recurred, or has temporarily or finally ceased . . . . Such modification, reinstatement, [or] suspension . . . shall be made as of the date upon which it is shown that the disability of the injured employe has increased, decreased, recurred, or had temporarily or finally ceased[.]

77 P.S. § 772. "Under [the Act], the term 'disability' is synonymous with loss of earning power." *Donahay v. Workers' Comp. Appeal Bd. (Skills of Cent. PA, Inc.)*, 109 A.3d 787, 792 (Pa. Cmwlth. 2015). Therefore, "[i]f the reduction in earnings is not tied to a loss of earning power attributable to the work injury, no disability benefits are due." *Id.* at 793.

## 1. Employer's Suspension/Modification Petitions

Claimant argues[19] that the Board erred by upholding the WCJ's suspension of Claimant's benefits from May 13 to August 10, 2016 because, at the September 12, 2016 hearing, Employer amended both Suspension Petitions to

---

[18] "On review[,] this Court must determine whether constitutional rights were violated, errors of law were committed, or necessary findings of fact were supported by substantial competent evidence." *Stepp v. Workers' Comp. Appeal Bd. (FairPoint Commc'ns, Inc.)*, 99 A.3d 598, 601 n.6 (Pa. Cmwlth. 2014).

[19] Rather than being argued separately under a distinctively displayed heading as Pennsylvania Rule of Appellate Procedure 2119(a) requires, Claimant addressed this issue in and among Claimant's argument that the denial of her Reinstatement Petition was not in accordance with the facts or legal precedent. *See* Claimant Br. at 32-33.

Modifications Petitions, thereby withdrawing the Suspension Petitions. Claimant further contends that the WCJ erred by suspending her benefits from May 13 through August 10, 2016, when competent evidence and legal authority did not support the WCJ's conclusions that Claimant rejected available work in bad faith, and she was only offered 24 hours per week.

Relative to Claimant's procedural claim, "a suspension of benefits is appropriate where the employer establishes that the claimant has recovered all of his or her earning power; otherwise, benefits are only modified." *Se. Pa. Transp. Auth. (SEPTA) v. Workers' Comp. Appeal Bd. (Cunningham)*, 72 A.3d 814, 817 (Pa. Cmwlth. 2013). The Pennsylvania Supreme Court has explained:

> An important distinction exists as to the relief offered between a suspension of benefits versus a modification of benefits. When a claimant's benefits are suspended, the claimant no longer receives any [WC] benefits because the claimant's physical disability no longer adversely affects her earning power since she can earn wages equal to or greater than her pre-injury wages. However, when the claimant's benefits are modified, the claimant receives a portion of her original [WC] benefits since her physical disability only allows her to regain some, rather than all, of her pre-injury earning capacity.

*United Cerebral Palsy v. Workmen's Comp. Appeal Bd. (Emph)*, 673 A.2d 882, 883 (Pa. 1996).

Employer filed the March 2016 Suspension Petition after Claimant was approved for modified-duty work; Employer offered her a job within her restrictions at "sufficient hours available which w[ould] allow [her] to meet [her] pre-injury wage[,]" but Claimant refused the offer. R.R. at 599a. Employer filed the May 2016 Suspension Petition after Claimant was released to her pre-injury job as of April 22, 2016, and Claimant was offered work in her pre-injury position at her pre-injury wage. *See* R.R. at 604a. However, in light of Claimant's concurrent employment

and the Amended Statement of Wages recognizing Claimant's actual average weekly wage of $972.14, and the statement in each of Employer's March 8, April 22, July 19, 2016 letters that she would be paid partial disability benefits in the event her work injury prevented her from earning her average weekly wage, *see* R.R. at 599a, 604a, 617a, Employer's March 8 and April 22, 2016 job offers purportedly matching Claimant's $531.50 average weekly wage did not actually equal Claimant's pre-injury wage. Therefore, Employer necessarily amended the Suspension Petitions to Modification Petitions, and the WCJ properly awarded Claimant modified benefits between March 27 and May 12, 2016.

At the September 16, 2016 WCJ hearing, Employer's counsel stated: "I filed two Suspension [P]etitions that I would like to amend to a Modification." R.R. at 131a. It would appear that, rather than *withdrawing* the Suspension Petitions, Employer intended for modification to be *added to* or *incorporated with* its suspension requests. Notably, Employer's counsel also stated at the hearing: "Employer's still seeking a decision on its Suspension/Modification Petition[s] from the date of the first job offer until Claimant eventually returned to work as of August 15, 2016[.]" R.R. at 130a-131a. In the May 22, 2017 decision, the WCJ ruled: "Employer's Petitions for *Suspension and* Modification are granted. . . . Claimant's . . . May 13, 2016 through August 10, 2016 benefits are suspended." WCJ Dec. at 15 (emphasis added). Because the record supports that Employer did not withdraw the Suspension Petitions but, rather, amended them to Suspension/Modification Petitions, the WCJ did not err by modifying Claimant's benefits for periods when she "regain[ed] some, rather than all, of her pre-injury earning capacity[,]" and suspending Claimant's benefits for periods when her "physical disability no longer adversely affect[ed] her earning power[.]"[20] *United Cerebral Palsy*, 673 A.2d at 883.

---

[20] Even assuming, *arguendo*, that the Suspension Petitions were *withdrawn*, the WCJ was nevertheless authorized to suspend Claimant's benefits.

Relative to Claimant's merits argument that the WCJ erred by suspending her benefits between May 13 through August 10, 2016, this Court has declared:

> The employer has the burden of proving that the claimant's work-related injury has improved sufficiently for the claimant to return to work and that a job the claimant is capable of performing is available to the claimant; once the employer meets this burden, the burden shifts to the claimant to demonstrate that he or she responded to the job offer in good faith.[21]

*SEPTA*, 72 A.3d at 817. "'If the claimant does not exercise good faith, then h[er] benefits can be modified [(*i.e.*, suspended)].'"[22] *Dixon v. Workers' Comp. Appeal Bd.*

---

> Although suspensions[] are generally reviewed after an employer files a petition, this Court has held:
>
> > [A] WCJ has authority to suspend[] a claimant's benefits in the absence of a formal petition where doing so would **not be prejudicial** to the claimant, *i.e.*, the claimant is **put on notice** that a suspension[] is possible and is given the **opportunity to defend** against it. . . .
>
> *Krushauskas v. Workers' Comp. Appeal Bd. (Gen. Motors)*, 56 A.3d 64, 71 (Pa. Cmwlth. 2012).

*Furnari v. Workers' Comp. Appeal Bd. (Temple Inland)*, 90 A.3d 53, 63 (Pa. Cmwlth. 2014) (emphasis added).

Here, Employer's Suspension Petitions clearly placed Claimant on notice well before the September 12, 2016 hearing that Employer did not intend to pay Claimant benefits for periods during which her disability was not caused by her work injury. Claimant had the opportunity to and did respond to the Suspension Petitions. In addition, Employer's mere amendment of the Suspension Petitions to Modification Petitions at the hearing did not make Claimant eligible for modified WC benefits to which she was not legally entitled. Based upon the totality of the circumstances, Claimant would not have been prejudiced by the WCJ suspending her benefits from May 13 to August 10, 2016 without the Suspension Petitions.

[21] "In this context, [lack of good faith (*i.e.*,] bad faith[)] does not mean 'overt malfeasance on the part of the claimant, but is merely the characterization of [the c]laimant's action for refusing to follow up on a job referral without a sufficient reason.'" *Napierski v. Workers' Comp. Appeal Bd. (Scobell Co., Inc.)*, 59 A.3d 57, 61 (Pa. Cmwlth. 2013) (quoting *Johnson v. Workmen's Comp. Appeal Bd. (McCarter Transit, Inc.)*, 650 A.2d 1178, 1180 (Pa. Cmwlth. 1994)).

[22] The term *modified* in this suspension context, as in the cited cases, means *changed or altered*, rather than modified versus suspended. *See Dixon v. Workers' Comp. Appeal Bd. (Medrad,*

*(Medrad, Inc.)*, 134 A.3d 518, 522 (Pa. Cmwlth. 2016) (quoting *Bey v. Workers' Comp. Appeal Bd. (Ford Electronics)*, 801 A.2d 661, 666 (Pa. Cmwlth. 2002)); *see also Darrall v. Workers' Comp. Appeal Bd. (H.J. Heinz Co.)*, 792 A.2d 706, 714 (Pa. Cmwlth. 2002).

In determining whether the WCJ properly concluded that Employer met its burden and Claimant did not, this Court must determine whether substantial evidence supported the WCJ's factual findings. *Stepp v. Workers' Comp. Appeal Bd. (FairPoint Commc'ns, Inc.)*, 99 A.3d 598 (Pa. Cmwlth. 2014). "Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Washington v. Workers' Comp. Appeal Bd. (State Police)*, 11 A.3d 48, 54 n.4 (Pa. Cmwlth. 2011) (quotation marks omitted).

In the instant matter, during Kent's depositions, Employer presented Claimant's work status notes, return to work evaluations, job offer letters, schedules, failure to accept suitable work notices, emails, weekly time slips, earnings statements and call-off records that established Employer's numerous job/shift offers, when Claimant worked, when she declined jobs/shifts and the reasons therefor.

Kent described that she directs the largest Bayada office, with "tons of clients" and "open[ing]s every day, every shift." R.R. at 525a. She acknowledged that, as a nurse working in the field, Claimant was "a per diem employee. She ha[d] no requirement to work any number of hours[,]" and it would not be unusual for Claimant to accept some jobs and decline others. R.R. at 583a.

Specifically regarding the period between May 13 and August 10, 2016, Kent testified that, based upon Dr. Colton's notification that Claimant could return to her pre-injury job without restrictions, on May 12, 2016, Employer offered Claimant a full-time assignment working Monday through Sunday from 7:00 a.m. to 4:00 p.m.

---

*Inc.)*, 134 A.3d 518 (Pa. Cmwlth. 2016); *Darrall v. Workers' Comp. Appeal Bd. (H.J. Heinz Co.)*, 792 A.2d 706 (Pa. Cmwlth. 2002).

beginning May 13, 2016, which she declined, stating merely that she was not available. *See* R.R. at 521a, 607a. Also on May 12, 2016, Employer offered Claimant a job for Saturday, May 14, 2016 from 9:30 a.m. to 5:00 p.m., which Claimant refused because she only wanted jobs requiring her to lift 40 pounds or less, and the scheduled client was too heavy. *See* R.R. at 520a, 606a. In addition, on May 12, 2016, Employer offered Claimant an assignment beginning May 17, 2016, on Monday and Tuesday from 9:00 a.m. to 1:00 p.m., which Claimant refused because it was too far to travel for a four-hour shift. *See* R.R. at 524a, 608a.

On May 16, 2016, Claimant attended orientation on a new case and accepted two shifts on that case, but did not work either of them. *See* R.R. at 523a, 530a. Claimant was scheduled to work on Thursday, May 19, 2016 from 11:00 p.m. to 7:00 a.m., but emailed Employer that her doctor issued new orders that she was to avoid heavy lifting; that evening, she called off her scheduled shift due to arm pain. *See* R.R. at 523a, 527a-528a, 610a. Claimant was also scheduled to work on Saturday, May 21, 2016 from 9:00 a.m. to 3:00 p.m., but she called off because she was not comfortable working with the client. *See* R.R. at 523a, 529a, 609a. However, Claimant worked on May 24, 2016 from 7:15 a.m. to 5:00 p.m. and May 26, 2016 from 7:00 a.m. to 4:00 p.m. with a client (she worked with in April) who required no lifting, and she oriented (observed) regarding a new client on May 25, 2016 for 7.5 hours. *See* R.R. at 533a-534a.

Kent stated that, on June 1, 2016, Claimant informed Employer that, "[a]s of [May 31, she's] on light duty" but was waiting for her work assignment. R.R. at 531a, 612a. That same day, Employer offered Claimant several nursing shifts within those restrictions. Specifically, Employer offered and Claimant worked two shifts that did not require lifting on June 2, 2016 from 7:00 a.m. to 5:00 p.m., and on June 3, 2016 from 7:00 a.m. to 4:30 p.m. *See* R.R. at 535a, 580a-582a, 613a. By June 2, 2016 email, Employer also offered Claimant a job with an infant on Fridays

from 7:30 a.m. to 6:30 p.m., or overnights Fridays, Saturdays and Sundays from 10:30 p.m. to 6:30 a.m. *See* R.R. at 614a. On June 3, 2016, Claimant responded that she is "on light duty and can't raise [her] arm or lift more than 10 [pounds.]" R.R. at 614a.

On June 6 and 10, 2016, Claimant accepted shifts working from 10:30 a.m. to 3:15 p.m. Claimant worked on June 6, 2016; however, after receiving notice from the client's school that Claimant was being rough with the child, the client's mother declined to have Claimant work with him on June 10. *See* R.R. at 536a, 538a-539a. Claimant accepted shifts on June 23, 25, 27, 29, 30 and July 2, 2016, but she ultimately scheduled off for all of them. *See* R.R. at 539a. Claimant never worked in the field with Employer's clients after June 6, 2016. *See* R.R. at 539a, 587a.

On July 15, 2016, Employer emailed Claimant regarding the availability of shifts with a client "within [her] restrictions" on Monday, July 18 from 7:00 a.m. to 5:00 p.m., Wednesday, August 24 from 7:00 a.m. to 5:00 p.m., Thursday, August 25 from 7:00 a.m. to 5:00 p.m., Monday, August 29 from 7:00 a.m. to 5:00 p.m., Friday, September 2 from 7:00 a.m. to 5:00 p.m., Saturday, September 3 from 8:00 a.m. to 4:00 p.m., and Monday September 5 from 7:00 a.m. to 5:00 p.m. *See* R.R. at 541a-542a, 616a. On July 18, 2016, Claimant responded to Employer that she was "able to do office work only." R.R. at 540a-541a, 615a.

Kent confirmed that, on July 19, 2016, after receiving official notification from Dr. Colton that Claimant was limited to light-duty office work, Employer offered Claimant work it had available in the office three days per week from 9:00 a.m. to 5:00 p.m. (i.e., 24 hours), during which Claimant would be required to make phone calls, fax, email, read clinical notes[23] and file papers. Employer

_____

[23] Kent explained that one of Claimant's office functions was to review patient clinical notes before they are placed on file to insure that the documentation is complete and accurate. *See* R.R. at 592a-594a, 731a. For example, if a note references a patient fall, the reviewer would make sure an incident report was also filed and cross-referenced. *See* R.R. at 593a-594a. Medicare regulations

offered Claimant ongoing office work three days per week from 9:00 a.m. to 5:00 p.m., beginning on Wednesday, July 20, Thursday, July 21, Friday, July 22, Monday, July 25, Tuesday, July 26 and Wednesday, July 27, 2016. *See* R.R. at 542a, 544a-546a, 617a. Claimant began the part-time office position on July 21, 2016. On July 29, 2016, Employer emailed Claimant her schedule for her office work for the upcoming two weeks: August 1, 2, 4, 9, 10 and 12. *See* R.R. at 550a-551a, 588a, 622a-623a. Kent recalled that "[e]ight hours a day [were] available, but [Claimant was] not really achieving that[,]" R.R. at 552a, since Claimant rarely worked the full 24 hours each week.

According to Kent and Claimant's time slips, Claimant worked on July 21, 2016 from 12:00 p.m. to 5:00 p.m., on July 22, 2016 from 9:00 a.m. to 5:00 p.m., on July 25 from 8:45 a.m. to 1:45 p.m. and then 4:15 p.m. to 5:00 p.m., on July 26, 2016 from 8:45 a.m. to 4:45 p.m., on July 27, 2016 from 9:00 a.m. to 1:15 p.m. and then 2:45 p.m. to 5:00 p.m., on August 1, 2016 from 9:00 a.m. to 1:20 p.m. and then 2:45 p.m. to 5:00 p.m., on August 2, 2016 from 9:00 a.m. to 1:20 p.m. and then 3:15 p.m. to 5:00 p.m., on August 4, 2016 from 9:00 a.m. to 1:15 p.m. and then 3:00 p.m. to 5:00 p.m., on August 9, 2016 from 10:00 a.m. to 12:45 p.m. and then 2:30 p.m. to 5:05 p.m., on August 10, 2016 from 9:00 a.m. to 1:15 p.m. and then 2:45 p.m. to 5:00 p.m., and on August 12, 2016 from 9:00 a.m. to 12:45 p.m. and then 2:25 p.m. to 5:00 p.m. *See* R.R. at 542a-543a, 620a-621a, 624a-625a, 627a.

Based upon Employer's records, Claimant worked:

Week of July 18, 2016 (Claimant started July 21) = 13 of 16 hours (*see* R.R. at 543a, 621a)

Week of July 25, 2016 = 21.50 of 24 hours (*see* R.R. at 543a, 620a)

require that Employer place patient care notes on file within seven days. *See* R.R. at 732a. If Medicare audited Employer and discovered record deficiencies, Employer would be subject to a plan of action, possibly including its services being put on hold. *See* R.R. at 735a.

Week of August 1, 2016 = 19.45 of 24 hours (*see* R.R. at 549a, 623a-624a)

Week of August 8, 2016 = 18.40 of 24 hours (*see* R.R. at 549a-550a, 625a)

Kent recalled that, after Claimant complained about her physical therapist, and said she did not want to go on her days off, Kent recommended that Claimant attend physical therapy approximately 7 minutes from the office in Paoli, so Claimant could undergo therapy during her work day lunch hours. *See* R.R. at 546a-548a. In Kent's personal physical therapy experience the year before, the whole process, including travel to and from the office, took only 55 minutes. *See* R.R. at 547a. Kent stated that Claimant took more extended time periods.[24] *See* R.R. at 546a-547a.

However, Kent was not sure that Claimant's missed work time from July 21 to August 12, 2016 was due to physical therapy. *See* R.R. at 745a. She described that, on August 10, 2016, Claimant arrived at 9:00 a.m., left at 9:15 a.m. for 1.5 hours and then returned and worked until 5:00 p.m. *See* R.R. at 552a, 627a. When asked by counsel where Claimant went, Kent responded:

> She doesn't tell us where she goes. I think there are times when she goes to therapy. There are times when she's outside talking on the phone. There are times when we think she's in the bathroom, but she's gone for an hour. It's hard to say. All I can do is clock when she comes in.

R.R. at 552a; *see also* R.R. at 745a.

Kent further testified that Claimant's office work consisted primarily of making phone calls, reading clinical notes and faxing. She continued:

---

[24] Kent described an incident on July 27, 2016, when Claimant caused an angry scene in the office and refused to sign her time sheet reflecting that she had taken lunch from 1:15 p.m. to 2:45 p.m., because she insisted Employer should pay for her therapy time. *See* R.R. at 543a-544a, 620a. Kent explained that Employer was providing what light-duty hours were available, and that reimbursement would be through the WC process. *See* R.R. at 589a.

20

A. . . . . We stopped doing filing because the performance just was not good.  We were having a lot of trouble.  Just generally the clerical duties, the performance has been a huge challenge for us.

Q. What do you mean by that?

A. I mean like I don't know whether she's not paying attention or she's on her phone or what's happening, but what we're finding is things are in the wrong place, they're in the wrong client's chart.  Even the alphabetizing that we had her do, there's things that should be in A and we find it in D.  I can't really come up with a good reason for why, but we've been challenged to find things that she will produce a quality product that we could give her enough work to keep her busy but not have to worry about the quality of the product.  I mean our client charts are really important, so we can't have somebody doing filing if [he/she is] not going to do a good job.  So we've been trying to concentrate on things that are simple, like phone calls and faxing and making packets and that kind of stuff.

R.R. at 555a.  On cross-examination, Kent reiterated that, as of August 16, 2016:

[Claimant was] not filing at all anymore[;]. . . she wasn't doing great with the filing.  She wasn't doing great with the alphabetizing.  She seemed to do okay with [] calling the field employees like to remind them of their in-service, that seemed to work out okay.  It didn't work out great making up the packets.  We found a lot of errors.  For example, we[']re very regulated, so our pre-employment pack has to have very specific forms in very specific order, like these forms on the left-hand side of the folder and these forms on the right-hand of the folder.  And we had her making up packets, pre and post conditional offer packets, that didn't go great.  There were some errors there.

Calling field employees seemed to work out okay.  The faxing the physicians, that seemed to work out okay.  The clinical filing did not work out okay.  The reading of the clinical notes, as far as I can tell, it seems like that has worked out okay.  I mean it's harder for me to know what the quality of the work is on that because if she doesn't see something in a note that she read, it wouldn't be until and unless a . . . Clinical Manager, happened to read that same

21

note and say, oh[] my God, I see something. [Claimant] read this note and she didn't tell me. So it would be harder for me to know that. But what I've heard thus far is it seems like that's going okay. So some of the things have gone okay, some of the things not so much.

R.R. at 591a-592a.

Q. Was that due to a physical inability to do that work or was it lack of effort?

A. It's hard to say. There was never a physical -- she never complained of any physical -- none of those are very physical jobs.[25] There were just a lot of errors. I mean there just were. If you ask my opinion, my opinion is she spends way too much time on her phone while she's here. And I have discussed that with her. I think that's one problem is like [sic] attention span. I don't know, I've thought, you know, does she not want to be here and so she's not doing a good job because then I won't have her here. I don't know. It's hard to say. . . .

Q. Has she expressed any difficulties performing this sedentary job that you've offered her in the office?

A. No.

R.R. at 594a-595a.

The law is well established that "[t]he WCJ is the ultimate factfinder and has exclusive province over questions of credibility and evidentiary weight." *Univ. of Pa. v. Workers' Comp. Appeal Bd. (Hicks)*, 16 A.3d 1225, 1229 n.8 (Pa. Cmwlth. 2011). "The WCJ, therefore, is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses." *Griffiths v. Workers' Comp. Appeal Bd. (Red Lobster)*, 760 A.2d 72, 76 (Pa. Cmwlth. 2000).

Here, the WCJ made the following relevant findings of fact:

---

[25] Kent stated that lifting binders out of drawers was the most physical thing Claimant had to do in the office. *See* R.R. at 556a, 559a. She recalled that her administrative assistant Emily Johannesen had been giving Claimant fewer clinical note reviews, so Claimant would not have to lift the binders. *See* 749a-750a.

22

33. This [WCJ] has carefully reviewed Claimant's testimony and she is found not credible. Claimant's testimony is rebutted by the credible testimony of [] Kent concerning the sedentary jobs offered to Claimant and her acceptance of some of the shifts and refusal of others. [] Kent's testimony is corroborated by office documentation as well as Claimant's e[]mails. In addition, Claimant's testimony is internally inconsistent in that she admits that she could work the sedentary job offered to her and that she received the Notice of Ability to Return to Work documents yet she did not try to work the sedentary shifts offered to her. In addition, Claimant's testimony that she never had any complaints about her job performance is not accepted as fact. The fact that Claimant was no longer given filing to do because of her poor performance is more credible than Claimant's statements. . . . **This [WCJ] finds that when Claimant's attempts to return to work at various times are review[ed] as a whole, she did not exercise good faith in her attempts to return to work.** Claimant's testimony is just not credible or persuasive and is rejected.

34. The depositions of [] Kent have been reviewed and are found to be credible and persuasive. [] Kent testified in great detail of Employer's efforts to always meet Claimant's restrictions and the large amount of shifts available to Claimant both full duty and sedentary duty. Claimant's bad faith in her return to work are documented by letters, e[]mails and time cards. The testimony of [] Kent is accepted as fact.

WCJ Dec. at 13.

Neither the Board nor the Court may reweigh the evidence or the WCJ's credibility determinations. *Sell v. Workers' Comp. Appeal Bd. (LNP Eng'g)*, 771 A.2d 1246 (Pa. 2001). Specifically, "Section 422(a) [of the Act, 77 P.S. § 834,] does not permit a party to challenge or second-guess the WCJ's reasons for credibility determinations. [Thus, u]nless made arbitrarily or capriciously, a WCJ's credibility determinations will be upheld on appeal."[26] *Pa. Uninsured Emp'rs Guar. Fund v.*

---

[26] Capricious disregard "occurs only when the fact-finder deliberately ignores relevant, competent evidence." *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862

*Workers' Comp. Appeal Bd. (Lyle)*, 91 A.3d 297, 303 (Pa. Cmwlth. 2014) (quoting *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 195 (Pa. Cmwlth. 2006)).  Finally, this Court has held:

> 'In performing a substantial evidence analysis, this [C]ourt must view the evidence in a light most favorable to the party who prevailed before the factfinder.'  'Moreover, we are to draw all reasonable inferences which are deducible from the evidence in support of the factfinder's decision in favor of that prevailing party.'  It does not matter if there is evidence in the record supporting findings contrary to those made by the WCJ; the pertinent inquiry is whether the evidence supports the WCJ's findings.

*3D Trucking Co., Inc. v. Workers' Comp. Appeal Bd. (Fine & Anthony Holdings Int'l)*, 921 A.2d 1281, 1288 (Pa. Cmwlth. 2007) (citations omitted) (quoting *Waldameer Park, Inc. v. Workers' Comp. Appeal Bd. (Morrison)*, 819 A.2d 164, 168 (Pa. Cmwlth. 2003)).

Claimant's argument that the May 13 through August 10, 2016 suspension was improper because she was offered hours earning less than her pre-injury wage until Employer offered her full-time office work on August 10, 2016 is not supported by the evidence the WCJ found credible.  Kent made clear that Employer had available as many shifts and hours as Claimant desired to work in the field.  Employer offered Claimant numerous shifts, which Claimant declined (by calling off, or because she felt a client was too heavy – despite that she no longer had lifting restrictions, she was busy or it was too far to travel to), so Claimant worked only four shifts between May 16 and May 26, 2016, two of which were new case orientation sessions.

On June 1, 2016, after being notified that Claimant could only perform light-duty nursing work subject to restrictions, Employer offered Claimant several

---

A.2d 137, 145 (Pa. Cmwlth. 2004).  Capricious disregard, by definition, does not exist where, as here, the WCJ expressly considered and rejected the evidence.  *Williams*.

24

nursing shifts within those restrictions, and Claimant accepted 10 shifts, but only worked 3. On July 15, 2016, Employer emailed Claimant regarding several nursing shifts available in July, August and September within her restrictions, in response to which Claimant declared that she was only able to do office work.

On July 19, 2016, after receiving official notification that Claimant was limited to light-duty office work, Employer offered Claimant the most office hours it had available. Notwithstanding that Claimant accepted and undertook the part-time office position, due to Claimant's extended breaks and lunch periods, Claimant worked only approximately 72 of the 88 part-time hours Employer offered to her through August 12, 2016. On August 10, 2016, Employer extended Claimant the full-time office job offer beginning August 15, 2016.

Employer established by credible record evidence that Claimant's work-related injury improved sufficiently for her to work, and that Employer made jobs available to Claimant that she was capable of performing. *See SEPTA*. Therefore, the burden shifted to Claimant to demonstrate that she responded to the job offers in good faith. *See id*. As a per diem employee, Claimant could accept some jobs and decline others. Despite that Employer consistently and repeatedly offered Claimant various jobs and shifts within whatever restrictions she was subject to at the time, Claimant did not accept work that would allow her to earn anywhere close to the 25 to 32 hours she previously worked for Employer, let alone her pre-injury wage, nor did she credibly establish that her reasons for declining or calling off work were due to her work injury. Thus, this Court concludes that Claimant did not demonstrate good faith in accepting work offered by Employer within her physical limitations. Because substantial record evidence supports the WCJ's decision suspending Claimant's benefits from May 13 through August 10, 2016, the Board properly upheld that portion of the WCJ's decision.

25

## 2. Claimant's Reinstatement Petition

Claimant also contends that the WCJ erred by denying her Reinstatement Petition. In particular, Claimant asserts that the WCJ failed to examine the relationship between her discharge and her work injury, and erred by concluding that Employer met its burden in opposing the Reinstatement Petition. Claimant contends that but-for Employer withdrawing her light-duty office position, she was able to continue working. *See* R.R. at 202a.

> The law regarding reinstatement following suspension is well settled:

> A claimant seeking reinstatement of suspended benefits must prove that: (1) h[er] earning power is once again adversely affected by the work-related injury; and, (2) the disability that gave rise to the original claim continues. *Bufford v. Workers' Comp. Appeal Bd. (N. Am[.] Telecom)*, . . . 2 A.3d 548 ([Pa.] 2010); *Teledyne McKay v. Workmen['s] Comp. Appeal Bd. (Osmolinski)*, 688 A.2d 259 (Pa. Cmwlth. 1997). Once the claimant meets this burden, the burden shifts to the party opposing reinstatement to show that the claimant's loss in earnings is not caused by the disability arising from the work injury. *Bufford.*

> [Generally, u]nder a suspension of benefits, . . . an employer remains responsible for the consequences of a work injury. *Magulick v. Workers' Comp. Appeal Bd. (Bethlehem Steel)*, 704 A.2d 176 (Pa. Cmwlth. 1997). This is because the injury is presumed to continue, yet a claimant suffers no related loss of income. *Id*. . . .

*Dougherty v. Workers' Comp. Appeal Bd. (QVC, Inc.)*, 102 A.3d 591, 595 (Pa. Cmwlth. 2014).

This Court acknowledges that "[t]he burden of proof . . . is different when a modification [(i.e., suspension)] of benefits occur[red] due to the claimant's bad faith." *Ward v. Workers' Comp. Appeal Bd. (City of Phila.),* 966 A.2d 1159, 1162 (Pa. Cmwlth. 2009); *see also Napierski v. Workers' Comp. Appeal Bd. (Scobell Co., Inc.)*, 59 A.3d 57 (Pa. Cmwlth. 2013). Under those circumstances, in order to

26

have total disability benefits reinstated, "the claimant must establish h[er] medical condition worsened to the point [s]he can no longer perform the employment previously found available." *Ward*, 966 A.2d at 1162; *see also Napierski*.[27]

> This Court has explained:
>
> In the case of an employee who has accepted and performed the light-duty job, the focus of the inquiry is on the employee's reason for losing the job . . . . Where, however, the employee has not even accepted the proffered light duty job at the outset, this same principle does not apply because the employee, being at that time unemployed as a result of his rejection of acceptable employment, has no earnings to lose. In this situation, the inquiry is to determine whether the employee acted in 'good faith' in refusing the job in the first instance.

*Johnson v. Workmen's Comp. Appeal Bd. (McCarter Transit, Inc.)*, 650 A.2d 1178, 1181-82 (Pa. Cmwlth. 1994) (quotation marks omitted).

Here, the parties and their medical witnesses agree that Claimant's work-related injury limited her to light-duty office work, Claimant accepted Employer's August 10, 2016 job offer, and Claimant began working in Employer's office full-time on August 15, 2016. According to Employer's documentation, due to Claimant's breaks and extended lunch periods, Claimant worked 35 hours for Employer during the weeks of August 15, 2016 (August 15, 16, 17, 18, 19) and

---

[27] [O]nce a claimant has refused an available job in bad faith, h[er] employer's obligation to show job availability ends. . . . The claimant must 'live with the consequences of [her] decision,' meaning that [s]he cannot remedy the situation 'by subsequent action' such as attempting to accept the job that was previously offered. *Johnson*, 650 A.2d at 1182. Instead, the claimant must show a worsening of h[er] medical condition to be granted a reinstatement to total disability. *Ward*, 966 A.2d at 1162.

*Napierski*, 59 A.3d at 62. "It matters not that an employer might be able to provide another job for the claimant; it cannot be forced to do so more than once." *Id.* at 63.

August 22, 2016 (August 22, 23, 24, 25, 26), and eventually worked 40 hours during the week of August 29, 2016 (August 29, 30, 31, September 1, 2). *See* R.R. at 187a-190a, 203a, 211a, 245a-247a. Kent described that, although Claimant did not necessarily work 40 hours, she worked "pretty much full-time through September 2[, 2016,]" without physical difficulty doing the job. R.R. at 728a.

Kent recalled the Claimant was off work from September 5 to 8, 2016 due to chest pains not related to her work injury. Kent described that, with the exception of her extended lunch break, Claimant worked a full day on Friday, September 9, 2016. *See* R.R. at 729a-730a. She testified that Claimant called off Monday, September 12, 2016 "because her arm [wa]s still in pain." *See* R.R. at 730a. Kent represented:

> [Claimant] said she went to the [emergency room] again over the weekend, and [was told] she may have a pinched nerve, but that she should see her own doctor. She said she has a note proving she went to the hospital, but has yet to make an appointment with her doctor because they're [sic] on vacation.

R.R. at 730a. Thereafter, Claimant worked on September 13, 2016, but only until 3:00 p.m. *See* R.R. at 730a-731a. Claimant treated with Dr. Colton on September 13, 2016. September 13, 2016 was the last day Claimant reported for work.

According to Dr. Colton, Claimant's treatment on September 13, 2016 was for "left shoulder pain" that she claimed increased after Dr. Kelman had her perform dynamometer testing[28] during her September 8, 2016 IME. R.R. at 718a; *see also* R.R. at 660a. She also complained of intermittent tingling and numbness and a burning sensation down her left arm and on the left side of her face, for which Dr. Colton ordered a cervical MRI. *See* R.R. at 718a. Dr. Colton ordered Claimant to

---

[28] The test was of Claimant's forearm strength to her elbow, and required only that she squeeze her fingers around the device. *See* R.R. at 659a-661a.

28

remain off work pending the MRI and re-evaluation. Dr. Kelman testified that Claimant did not complain of cervical issues during her September 8, 2016 IME, and he did not relate Claimant's cervical complaints to her work injury.

Kent acknowledged that Employer received Dr. Colton's September 13, 2016 work status note that "[Claimant] will remain out of work until re[-]evaluation after an MRI is completed." R.R. at 757a; *see also* R.R. at 739a-740a, 750a. Kent expressed that, although Employer did not hear from Claimant again for 10 days, she was not unaware of why Claimant was off work.[29] *See* R.R. at 733a, 739a-740a, 757a.

Kent further recalled that, when Claimant informed Employer on September 23, 2016, that she could return to work as of September 26, 2016, Kent informed Claimant that the light-duty office job was no longer available. *See* R.R. at 732a-733a, 741a-744a, 750a-751a. Kent confirmed that Employer replaced Claimant and hired an additional administrative staff person to help one day per week, so Employer's administrative duties were covered, and Employer's office space was at physical capacity ("very full seat-wise as well"). R.R. at 751a.

The record evidence clearly establishes that Employer offered Claimant a full-time, light-duty office position, which Claimant accepted and began working on August 15, 2016.[30] Thus, the reason for Claimant's May 13 to August 10, 2016 suspension (i.e., her refusal to accept available work within her restrictions) no longer existed. Although Claimant worked nearly full-time hours, her partial disability

---

[29] When Kent was asked what she understood about Claimant's absence between September 13 and 23, 2016, Kent responded: "I'm not stating that I had no idea what was going on with [Claimant]. What I would say is that I had no idea if [she] was going to return, and if so, when that would have been." R.R. at 740a.

[30] This was no longer a situation in which Claimant refused an offered job in bad faith, which is the standard Employer asks this Court to apply.

benefits were modified effective August 15, 2016, because she was still earning less than her time-of-injury wages. *See* R.R. at 764a.

Claimant called off work September 12, 2016 with complaints of increased arm pain, purportedly resulting from her September 8, 2016 IME. Following her September 13, 2016 examination, Dr. Colton ordered Claimant off work until a cervical MRI and further evaluation could take place. Despite that Employer was aware of Dr. Colton's order, during the 10 days that Claimant remained off work, Employer hired someone else to do Claimant's light-duty office job.

Where Claimant is seeking reinstatement of total disability benefits after losing a light-duty job she accepted and was performing, **the focus must be on the** "**reason for losing the job**[,]" and not that Claimant had previously declined acceptable work. *Johnson*, 650 A.2d at 1181 (emphasis added). However, in this case, the WCJ and the Board applied the standard for reinstatement after suspension for lack of good faith (i.e., Claimant's work injury worsened such that she could no longer do the work),[31] when they should have applied the burden for reinstatement after suspension (i.e., Claimant's work injury continues and again adversely affects her earning power).

This Court expounded regarding the latter standard:

> As to the [] element[] that the disability that gave rise to the original claim continued, a claimant may satisfy h[er] burden as to continuation of h[er] work injury through h[er] own testimony. *Teledyne*. . . .

---

[31] The WCJ found: "Claimant has not proven her condition related to her work injury has worsened[,]" and that "Claimant ha[s] not proven that her light[-]duty or sedentary job was taken away from her. Claimant did not exercise good faith in her return to modified duty." WCJ Dec. at 14. The WCJ concluded: "Claimant has not proven that she had a basis for reinstatement of her benefits. Thus, her [Reinstatement Petition] must be denied and dismissed." WCJ Dec. at 15.

> As to the [] element[] that a claimant's earning power is once again adversely affected by the work injury, where a claimant returns to work with restrictions related to the injury (a modified position), and is subsequently laid off, a claimant is entitled to the presumption that the loss of earning power is causally related to the work injury. *Folk v. Workers' Comp. Appeal Bd. (Dana Corp.),* 802 A.2d 1277 (Pa. Cmwlth. 2002); *Teledyne.* Stated differently, **when a claimant does not return to h[er] pre-injury job, and is then laid off from the modified duty job, the law presumes the layoff and attendant loss of earnings is attributable to the continued injury, shifting the burden to an employer to rebut the presumption**. *Folk.*

*Dougherty*, 102 A.3d at 595 (emphasis added).

Because it is undisputed in the instant matter that Claimant's work injury continued, and limited her to light-duty office work from which Employer discharged her, **Claimant [wa]s "entitled to the presumption that [her] loss of earning power is causally related to [her] work injury," and the burden shifted to Employer to rebut the presumption by showing that Claimant's earnings loss was not caused by her work injury**. *Id.* (emphasis added).

In response to Claimant's Reinstatement Petition, Employer stated: "Claimant stopped working for reasons unrelated to the compensable injury and[,] therefore[,] the resultant loss of earnings is unrelated to the compensable work injury." R.R. at 50a. In its brief, Employer expounded that Claimant's earnings loss was not caused by her work injury, since she was out of work from September 13 to 23, 2016 for cervical issues not related to her work injury, and because her work performance was substandard.

However, absent bad faith or misconduct relative to her full-time sedentary job after August 15, 2016, "[u]nsatisfactory work performance alone d[id] not suffice to deprive Claimant of reinstatement of benefits." *Dougherty*, 102 A.3d at 598. Moreover, the record evidence clearly reflects that Employer discharged Claimant because Employer did not know if or when Claimant would return to work.

31

The WCJ found: "After Claimant failed to return to work, someone was hired to fill her spot[.]" WCJ Dec. at 12. Employer produced no evidence that, at the time it rescinded Claimant's job, it did so because Claimant's absence was not related to her work injury. The WCJ found credible and accepted as fact Dr. Kelman's testimony that Claimant's cervical complaints after the September 8, 2016 IME were not related to Claimant's work injury, and did not stem from the dynamometer test, so Claimant was still limited by her work injury to the sedentary office job. *See* WCJ Dec. at 12, 13. The WCJ also found:

> Claimant's allegations that her sedentary job was taken away from her is specifically rejected. This [WCJ] accepts that Claimant . . . did not return because of non-work related issues. Claimant took off for her cardiac issues. When she returned to work, she claimed arm and neck pain prevented her from continuing to work which are not related to her work injury. Dr. Colton took Claimant out of work on September 13, 2016 in part because her neck was bothering her. Claimant however testified that as of September 12[,] 2016, she had no trouble performing the sedentary job and could have kept working. This [WCJ] finds that when Claimant's attempts to return to work at various times are review[ed] as a whole, she did not exercise good faith in her attempts to return to work. Claimant's testimony is just not credible or persuasive and is rejected.

WCJ Dec. at 13. The Board agreed.

Importantly, because the WCJ found that Claimant complained of "*arm and* neck pain" on September 13, 2016, and further acknowledged that Claimant's time off work was due only "in part" to neck issues, it was inconsistent for the WCJ to conclude that Claimant did not work between September 13 and September 23, 2016 "because of non-work[-]related issues." WCJ Dec. at 13 (emphasis added). In addition, despite that the WCJ found Claimant had previously declined acceptable work Employer offered Claimant within her restrictions before August 10, 2016, the

WCJ did not specifically find that Claimant committed bad faith or misconduct related to her full-time sedentary job thereafter. Accordingly, it is not evident that Claimant's earnings loss after September 26, 2016 was attributed to anything other than her work injury.

Where, as here, causation is presumed, and the burden shifted to Employer to prove that Claimant's disability after September 26, 2016 was not caused by her work injury, the WCJ and the Board erred by placing the burden on Claimant to demonstrate that her medical condition worsened. Because the WCJ failed to apply the presumption of causation and placed the burden of proof on Employer, a remand is necessary for the WCJ "to apply the proper presumption of causation and [burden] to the facts found here, based on the existing record." *Dougherty*, 102 A.3d at 597.

**Conclusion**

Based upon the foregoing, this Court affirms the portion of the Board's order upholding the WCJ's decision suspending Claimant's benefits from May 13 to August 10, 2016. This Court vacates the portion of the Board's order affirming the WCJ's decision denying Claimant's Reinstatement Petition, and remands to the Board to remand to the WCJ to apply the correct presumption and burden, based on the existing record, consistent with this opinion.

_____
ANNE E. COVEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Monifa Holmes,                          :
                    Petitioner        :
                                 :
                  v.                    :
                                 :
Workers' Compensation Appeal            :
Board (Bayada Home Health               :
Care, Inc.),                            :          No. 43 C.D. 2019
                    Respondent        :

## O R D E R

AND NOW, this 12th day of December, 2019, the Workers' Compensation Appeal Board's (Board) December 17, 2018 order is AFFIRMED in part and VACATED in part. This matter is REMANDED to the Board to remand to the Workers' Compensation Judge in accordance with this opinion.

        Jurisdiction is relinquished.


                                   _____
                                   ANNE E. COVEY, Judge